# Richmond.

## JONES v. McGRUDER.

### January 22d, 1891.

1. FRAUD—*Circumstantial evidence.*—A transaction may, of itself and by it-self, furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of the defendants, and even the evidence of witnesses. *Parr* v. *Saunders*, Vol. XIV., Va. Law J., 437.

2. IDEM—*Undue influence—Cancellation of deeds—Case at bar.*—Grantor, an habitual drunkard, died from brain softening shortly after executing certain deeds. His physician, landlord, neighbors and intimates testified he was mentally incapable of transacting business. Witnesses, relatives and friends, living at a distance, merely expressed opinion to the contrary without giving reasons. The beneficiaries, his most trusted friends, assisted him in executing the deeds; one was his own cousin, possessing over him unbounded influence. There was no consideration, and existence of the deeds was concealed from grantor's family and counsel: *held*, the deeds should be cancelled.

Appeal from decree of chancery court of city of Richmond, rendered November 16th, 1889, in a suit wherein Jenkins M. Jones, Mary E. Brock, M. Johnson Brock, her husband, Nannie M. Marshall, Ella W. Jones, John K. Jones and Morgan T. Jones, the last three being infants suing by their mother, Sarah E. Jones, are complainants, and William M. McGruder, John T. Jones, Jerry W. Jones, M. M. Gilliam and John K. Branch, trustees, and John P. Branch, are defendants. The decree being adverse to the complainants, they appealed. Opinion states the case.

*Page & Carter* and *Pegram & Stringfellow*, for the appellants.

*M. M. Gilliam, Thomas S. Martin* and *Samuel D. Davies*, for the appellees.

FAUNTLEROY, J., delivered the opinion of the court.

The record discloses the following case: On the — day of April, 1887, the petitioners and their mother, Sarah E. Jones, filed a bill in the chancery court of the city of Richmond against William M. McGruder, John T. Jones, and Jerry W. Jones, to set aside the deeds hereinafter referred to; and the defendants having demurred to the bill on the ground that Mrs. Sarah E. Jones was not a proper party to the suit, the court sustained the demurrer and dismissed the bill, with leave to petitioners to bring another suit without joining their mother. Thereupon, on the 5th day of August, 1887, petitioners, as children and heirs-at-law of John E. Jones, deceased, filed their bill alleging that their said father died, intestate, February 18th, 1887, in Henrico county, Virginia; that Thomas N. Page qualified as administrator of his estate on the — day of April, 1887, in due form; that their father, John E. Jones, and their mother, Sarah E. Jones, lived unhappily together, and the latter, in 1884, instituted her suit for divorce and alimony, which was dismissed in 1885; that John E. Jones was then possessed of some real estate in Henrico county, Virginia, in his own right, and of a very large estate in right of his wife, in which he had a life interest only; that attempts had been made to secure a division of this property for the separate enjoyment of John E. Jones and Sarah E., his wife, which failed; that John E Jones was, and for a long time had been, an inordinately and constantly intemperate man, of impaired mind and will power; and, greatly and irresistibly under the influence of his first cousin, John T. Jones, and one

William M. McGruder; that these two men approached Sarah E. Jones, as agents for John E. Jones, to procure a division of the property aforesaid between John E. Jones and Sarah E. Jones, which they said they could effect; and that, after long and frequent negotiations, such division was made by deed of November 24th, 1886; that during all the negotiations leading up to, and consummated by the said deeds, neither Sarah E. Jones nor her counsel ever saw John E. Jones; and it was a matter of discussion as to how, and to whom, these deeds should be made, so as to free the property allotted to John E. Jones and Sarah E. Jones, respectively, in severalty from their respective *marital rights;* that it was finally decided to convey Mrs. Jones' allotment or portion to a trustee; and so, also, to convey John E. Jones' part to some third party for him; that when this agreement was reached, the names of the *intermediary* grantees had not been mentioned; but finally Thomas N. Carter was selected for Mrs. Jones, and it was proposed to convey John E. Jones' part to John T. Jones, who was his near relative and his closest friend, and who had been active, persistent, and assiduous in bringing about this settlement, when Mrs. Jones refused peremptorily to enter into any agreement which would put any part of her maiden property in the name, or control of John T. Jones; whereupon the conveyance was finally made to William M. McGruder and Jerry W. Jones, a young brother of John T. Jones, and then living with him. The bill further alleges that when the deed to McGruder and Jerry W. Jones was presented for inspection, there was no consideration expressed in the deed; but at the last instant, the blank was filled at $4,000 in hand paid, which Mrs. Jones and her counsel believed to be a merely nominal consideration and evidence of a secret trust, as all the parties knew that the property conveyed—that in Richmond alone—was worth from ten to twelve thousand dollars.

The bill further alleges that Jerry W. Jones and William M. McGruder now claim that they had previously purchased

from John E. Jones, on October 13th, 1886, all his interest in all property owned by him in his own right, and in all inherited by his wife, for $4,000, represented by their four notes, without security, of $1,000 each, payable at six, twelve, eighteen and twenty-four months after date; and that they had, on that 13th day of October, 1886, obtained from him a contract to convey the same whenever he should be called upon to do so; and that when the division was made between John E. Jones and his wife, they required the deed to be made to them of the part allotted to John E. Jones in fee-simple.

The bill charges (and the uncontradicted evidence proves), that the existence of this contract of October 13th, 1886, which is in the handwriting of John T. Jones, was carefully concealed from Mrs. Sarah E. Jones and her counsel, Thomas N. Page and T. N. Carter, during all the negotiations and at the execution of the deeds of November 24th, 1886; and that if Mrs. Jones, or her counsel, had known thereof, she never would have consented to an agreement which gave to McGruder and Jerry W. Jones, in fee, more than $10,000 worth of her maiden property for the sum of $4,000 nominally paid to her husband, but of which he had never received one cent.

It is further alleged in the bill, that although John T. Jones and William M. McGruder, and Jerry W. Jones, all knew of the transaction of October 13th, 1886, and of the qualification of Thos. N. Page as administrator of John E. Jones, deceased, they carefully and successfully concealed from Mrs. Jones and her counsel, and from the said administrator, and from the complainants, the fact of the existence of the contract of October 13th, or that these notes had ever been given, and that they, or either of them, held them, and held them endorsed by John E. Jones; and so, in themselves, a receipt in full; and the fact that they were unpaid; and that these facts, and the existence of the 13th of October contract itself, were only revealed, in the spring of 1887, after the litigation to set aside the fraud had been actually begun.

The bill charges that the contract of October 13th, 1886 (which was signed by John E. Jones alone, and not by the other parties to it), was a fraud on John E. Jones, whose mind and will were too much impaired and enfeebled by long-continued, incessant, and excessive drunkenness, to understand and resist the transaction; which was grossly imposed upon him by John T. Jones, William M. McGruder, and Jerry W. Jones, who had unbounded and undue influence over him; and who dominated and imposed upon him, for their own sinister ends, both in the obtaining of the said pretended contract of 13th of October, 1886, and the execution of the deed of November 24th, 1886, by which they had themselves named as grantees in and beneficiaries of said deed, instead of John E. Jones, by virtue of a pretended purchase; and that the deed of November 24th, 1886, was a fraud perpetrated by the said John T. Jones, William M. McGruder, and Jerry W. Jones, upon the said John E. Jones, an habitual, inveterate and helpless drunkard.

The bill charges that there was never any real purchase of the property conveyed by the deed of November 24th, 1886, from John E. Jones, by Jerry W. Jones and William M. McGruder; and that it was conveyed to William M. McGruder and Jerry W. Jones, without consideration, and for some purpose by which John E. Jones believed, and was made to believe, that it still belonged to him, while they held the legal title so as to bar the marital rights of his wife. But the bill expressly charges, that, if the real object and effect of that deed of November 24th, 1886, is to convey the property to the nominal vendees in that deed, that it was procured by concealment and fraud, and for no consideration; and that, therefore, the said vendees are mere trustees for John E. Jones, living, and for his children and heirs-at-law, he being dead. The bill charges that William M. McGruder and John T. Jones (who, it is alleged, is the actual purchaser with McGruder), were both insolvent; that Jerry W. Jones was John T. Jones's tool, used

by him to consummate the fraud, and was worth but little, if
anything; and that as soon as the deed of 24th of November,
1886, was given, a portion of the property was encumbered by
trust deed to secure $7,800, borrowed; and that of this sum a
large balance is in the hands of M. M. Gilliam, counsel for
Jones and McGruder, who claims large fees out of the same.
Jerry W. Jones, William M. McGruder, John T. Jones, and M.
M. Gilliam are made parties defendant, with appropriate
prayer for relief, injunction, &c.

On the 8th of October, 1887, William M. McGruder and
Jerry W. Jones answered the bill; and on the 28th day of
February, 1889, after all the evidence had been taken, John
T. Jones and M. M. Gilliam filed their answers. The material
averments in the bill are all denied in these answers, to which
oath was waived in the bill; and.pleas were also filed setting
up the same defence as embraced in the answers.

The proofs consist of a number of letters, and a vast mass of
documentary evidence, and the depositions of sixty-eight wit-
nesses and the exhibits therewith, covering over seven hundred
closely written pages. On this written evidence the case was
heard; and on the 16th of November, 1889, the court entered
the decree, now appealed from, holding, for reasons assigned in
a written opinion, that John E. Jones, the father of the appel-
lants, was, on the 24th day of November, 1886, of sound mind,
and capable of attending to business; that the contract and
deed asked to be set aside were not obtained by undue or im-
proper influence; that John T. Jones was not interested in
them, nor in the property conveyed; that they were made
fairly and for valuable consideration, and were intended by
the parties to be absolute sales, with no secret trust resulting
to petitioner's father, or to petitioners; that William M. McGru-
der and Jerry W. Jones acquired and are decreed to hold the
property conveyed by the deed of 24th of November, 1886, in
fee-simple; and that the injunction awarded the complainants,
on 12th of August, 1887, be dissolved.

We do not deem it necessary—nor would it be possible, without swelling this opinion to improper length and prolixity—to go into a critical analysis of the vast volume of testimony contained in the record; but, having read, carefully, and maturely considered, it all, we can only give our conclusions of fact deduced from the general mass of testimony, on the one side and the other; and state the law of the case upon the record—with special allusions and criticism upon the salient and controlling points of the evidence. We are of opinion that the case made by the bill, is fully sustained by the evidence; and that the chancery court erred, in refusing to hold that the contract of October 13th, 1886, and the deed of 24th of November, 1886, are fraudulent; and were procured by undue influence, artfully and systematically exerted over and upon John E. Jones—a drunken and helpless wreck of his former self—by John T. Jones, William M. McGruder, and Jerry W. Jones; and in not holding the nominal grantees in the said deed of November 24th, 1886, from John E. Jones and Sarah E. Jones, his wife, to William M. McGruder and Jerry W. Jones, to be trustees for the children and heirs-at-law of John E. Jones, deceased; and in dismissing the bill of the complainant. This, is not the suit of Mrs. Sarah E. Jones complaining of the settlement negotiated between her and John E. Jones, her husband, and effected by the deed of November 24th, 1886; by which she, in consideration of a cotemporaneous conveyance to her, by him, of a relinquishment of his marital right over a part of her maiden estate, conveyed to him a large and valuable portion of her inheritance. It is the suit of the children and lawful heirs of John E. Jones, deceased, invoking the aid and redress of a court of equity of a fraudulent device, cunningly planned, and craftily and skilfully executed, by which John E. Jones, their father, was betrayed and imposed upon by his trusted agents, relatives, and "own familiar friends;" and they, his children, are robbed of their rightful inheritance. John E. Jones, in October, 1886,

was a poor broken down drunkard, an habitual sot, with en-
feebled mind and will, who continued to grow worse, day by
day, until the 18th day of February, 1887, when he died from
softening of the brain and drunken debauch. The evidence
in the record to establish the mental incapacity of John E.
Jones, and the nefarious advantage which the defendants
took of his condition, in the fall of 1886, in the procurement
of the secret and concealed contract of the 13th of October,
1886, and in the execution of the deed of November 24th, 1886,
is overwhelming; notwithstanding the *opinions* of the witnesses
for the defendants, many of them—their relatives, friends, and
defendants—who, in nearly every instance, give merely their
opinions that John E. Jones had capacity enough, notwith-
standing his habits and condition, to know what he was doing,
without any facts or acts, from which the court may decide
whether their opinions are the result of any proper opportuni-
ties for judging, or are misconception, ignorance, collusion, or
wilful distortion of truth. The witnesses for the complainants,
on the other hand, not only possessed far better opportunities
of judging and knowing of John E. Jones' mental condition,
but have stated facts and acts of his, from which the court can
decide, for itself, what his mental capacity and condition must
have been.

While most of the witnesses for the defendants, who give
their opinions that John E. Jones was capable to contract
in the fall of 1886, lived at a distance from Jones, on other
roads, or in Richmond, the plaintiff's witnesses were his
immediate neighbors, and comprise his landlord, his druggist,
his merchants, his family physician, and his most intimate
friends, who saw and visited him habitually, day after day.
Dr. Stapleton Coates, his family physician, than whom, the
evidence is, no man stood higher in Henrico county, either as
a man or a physician, says that he met John E. Jones frequently,
and practiced in his family for three years before his death;
that Jones was a very intemperate man, and that he supposed

that there must have been some permanent injury about the brain; that he supposed that the long-continued use of liquor had produced some impairment of mind; that in the fall of 1886, about September or October, he thought Jones' mind was giving away—gradually becoming more impaired. When he saw him last in the fall of 1886, he says: "I thought his mind a complete wreck;" and he gives his opinion as a physician and from his critical knowledge of Jones' condition, that in the fall of 1886, Jones "was not in a condition to transact any business of importance." He says, positively, that Jones showed permanent injury of the brain, the symptoms of which he had noticed at least three years before he died, and that many persons in the neighborhood thought that Jones was demented, and that it had increased on him. This is the testimony of his expert family physician. (*Cheatham* v. *Hatcher*, 30 Gratt., 65.) Mere opinions of a man's mental condition are comparatively worthless, and their weight or value depends on the opportunities which the persons holding them have had of forming correct opinions, and especially is this the case in respect to a man whose mind is charged to be affected by long and habitual excessive drinking. The testimony of more than fourteen of Jones' nearest neighbors, friends and domestics, is, that he was constantly so steeped in liquor, and his mind so impaired, that he was incapacitated for any business, and was extremely subject to imposition and undue influence and fraud, and that his general reputation, among those who lived with him, waited on him, worked for him, saw him day after day, and had most to do with him, was that his mind was impaired so as to make him say and do many acts and things which only a man irresponsible and out of his mind could do. In respect to his condition at the moment when the deeds assailed were actually executed, there were *three* witnesses who were present at the *factum*. John T. Jones swears, of course, that Jones was sober and in possession of his mental powers. Corydon Sutton only says: "As to his competency, at times,

when he was not under the influence of liquor, I would con-
sider him competent to make a deed." F. T. Sutton, who re-
members nothing of the attending circumstances, and only
knows that *he* took the acknowledgments, because he recog-
nizes his own signatures, says, that he considered him compe-
tent to make a contract, or he would not have taken his ac-
knowledgment.

But whatever may have appeared to have been John E. Jones
condition and apparent intention at the moment and in the act
of the *factum*, in the opinion or belief of others, there is no doubt
as to John T. Jones' knowledge of his cousin's condition in the
fall of 1886. Otis H. Russell, the postmaster of Richmond
city, testifies: "During the last year of John E. Jones' life, it
seemed to me that he had become almost incapacitated to trans-
act business properly; in fact, almost an imbecile, from the
use of alcohol. I think his condition was well known to John
T. Jones, because he and I talked over his situation and con-
dition a number of times, in which he expressed, in the kind-
liest feelings possible, his pity for his condition, and I did
the same to him. We often deplored his condition, both be-
ing friends of John E. Jones." He then refers to particular
conversations with John T. Jones on this subject, in one of
which John T. Jones said, "that in order to save some
$4,000, which John E. Jones had in bank from his wife's claims
in the divorce suit, he had advised John E. Jones to draw it
out and deposit it again in his, John T. Jones' name; that
John E. Jones often afterwards regretted that he had not taken
his advice. That his relations to John E. Jones being known
to his wife, it was almost impossible for him to see him at his
own home," &c. The witness, Russell, continues, "I don't re-
member his exact language, but the purport of the conversa-
tion was, that the poor fellow was incapacitated to transact
any business. He deplored that, as a fact, while explaining
the difficulty of his friends in helping him out of his difficul-
ties while such was his condition. All of the conversations in

relation to him, at different times, were of the most sympathetic
kind, *he expressing his fears that John E. Jones' wife and family
would strip him of all his property.*   That he was desirous of
saving as much of property for his cousin from his wife and
children as was possible, and had so advised him a number of
times.   He felt it his duty to do this, for it appeared to him
that he would be left a pauper by having all of his property
gotten hold of by his family; and I think the reason given by
him for his fear that his wife would secure it all, was that he·
got most of his property by his wife."   "That he had exercised
more influence over John E. Jones than any one else, and on
that account, his wife felt very angry with him."   " I believe
(said Russell) he exercised more influence over him than any
living being."   George W. Carter, for twelve years clerk of
Henrico, says, " I think probably John T. Jones had more in-
fluence with him, John E. Jones, than any other man."   James
R. Russell, a lawyer in Henrico, says:   "His friendship for
John T. Jones was almost unlimited, he probably thought
more of him than of any man living.   John T. Jones had great
power and influence over John E. Jones, on account of the
great love and respect he had for him; and in all his trouble
he seemed to consider John T. Jones his best friend.   John T.
Jones seemed to be the advising friend and main-stay in his
affairs.   Ever since I have known them they seemed to be as
two brothers."   Numerous witnesses testify that John T. Jones'
influence over John E. Jones was commanding, and that his
confidence in John T. Jones was unbounded.   He told Daniel
White that he believed "John T. Jones would die for him."
They were first cousins, had been intimate for thirty-five years,
and for all that time lived in five or six miles of each other.
John E. Jones was the security of John T. Jones on his official
bonds, as collector of taxes and also as sheriff of Henrico
county, and John T. Jones had been the friend and confiden-
tial adviser of John E. Jones in the divorce suit with his wife,
and, as such, had incurred her bitter enmity and intuitive dis-

trust. He was the representative and agent of John E. Jones in all the negotiations, sought and carried on by himself as such agent, with Col. John B. Young and Messrs. Thomas N. Page and Thomas N. Carter, counsel for Mrs. Sarah E. Jones, which finally resulted in the deeds of settlement or division of November 24th, 1886, and he had been his agent, representative and confidential adviser in divers other important matters. The record is full of incontrovertible proof that John T. Jones was the active friend, trusted agent, and confidential representative of John E. Jones whenever an occasion arose. He was every time and everywhere present when anything was considered or done affecting John E. Jones' property, and he wrote every paper that was written or executed in the negotiations from first to last.

There were two men—his near neighbors and most intimate friends, John T. Jones and William M. McGruder—on whom John E. Jones placed the greatest reliance, and in whom he confided implicitly and absolutely, without guard, suspicion, or reserve. He was McGruder's bondsman as treasurer of Henrico county, as he was also surety on the official bonds of John T. Jones as sheriff and as deputy treasurer, and he intrusted them with his business. These men, John T. Jones and McGruder, were as intimate as two men could possibly be; they were principal and deputy; they were partners in business enterprises; they were both insolvents, and they held and transferred property for and to each other, turn and turn about—*mutatis mutandis*—to keep their creditors from getting it, and they were always together, mutually assisting each other as adepts and graduates in the practice of fraud prior to the perpetration of the transaction under review in 1886. The evidence shows that John T. Jones was not only an insolvent, but he was indebted to McGruder as his deputy treasurer; and McGruder was insolvent and a defaulter to the Commonwealth, and had judgments against him for over $30,000. A noble pair of brothers!

John T. Jones, who, as the record shows, was the prime mover—the Mephistopheles in the legend of the fraud and treachery disclosed by this record—is described by one of his own witnesses and his sister's brother-in-law as "a man of great will power and determination, and a man of extraordinary capacity—cool, deliberate, calm—a man of affairs, with fine business experience." He was the principal witness for the defence, and, although he has sworn with great positiveness to every fact which he deemed necessary to the success of the case, he is contradicted, either by himself on cross-examination, or by many disinterested witnesses of as high character as any upon earth. He swears positively that he had no interest in the sale, or in the property, yet it was he who went with McGruder to the office of Sutton & Co., the agents of John E. Jones, who had the property in charge, and gave them formal notice that he and McGruder had purchased and then owned the property conveyed by the deed of November 24th, 1886, and that the rents were thenceforward to be paid to them and not to any other person. Corydon H. Sutton details the time, place and very words said by John T. Jones and assented to by McGruder. It was he who drew in his own handwriting the secret contract of sale of October 13th, 1886, of John E. Jones' life estate in his wife's large property, and of the fee in all of John E. Jones' own real property— worth at least $15,000—to McGruder and Jerry W. Jones for their unsecured notes for $4,000, payable in six, twelve, eighteen and twenty-four months, which were wholly worthless, and which several of the best business men in Richmond testify could not have been negotiated at any rate whatever, and which, one of them says, he would not even offer upon the market. Notes, too, which were drawn by John T. Jones and which were held by him, endorsed in blank by John E. Jones, and the existence of which, and his possession of which, as well as of the secret contract of October 13th, 1886, he never revealed, but carefully concealed, until after the death

of John E. Jones, in February, 1887, and only then after this suit had been instituted to set aside the fraud of the 24th of November, 1886. It was he, John T. Jones, who went with John E. Jones to Mr. Seldon Taylor's office to get his acknowledgment to the secret contract of October 13th, 1886, when John E. Jones was so drunk that Mr. Taylor ordered them out of his office; and it was he who was present afterwards at the execution of that paper, as he had been everywhere and every time that anything was ever said or done affecting the division of John E. Jones' property, and the transfer of his part of it to the insolvents, McGruder and his young brother and substitute, J. W. Jones. It was he, John T. Jones, who was present and proposed as one of the grantees in the deed conveying John E. Jones' share, and who would have been one of them but for Mrs. Jones' positive refusal to sign any paper or accede to any arrangement affecting her maiden land in which he was mentioned or recognized. It was John T. Jones who added, in his own handwriting, to the deed of conveyance of November 24th, 1886, to McGruder and Jerry W. Jones (who had been substituted in his stead) after it had been submitted to Mrs. Jones' counsel, all the fee-simple property owned by John E. Jones in Henrico and elsewhere. John T. Jones, when he was applied to in the spring of 1887 by Thomas N. Page, the administrator of John E. Jones, who had no knowledge of the existence of the secret paper of October 13th, 1886, or of the existence of the four notes which were the pretended consideration for the said contract signed only by John E. Jones, and binding upon him alone, left the said administrator, Page, under the impression that the consideration named in the deed as $4,000 had been paid in cash, as stated in the deed, although the said John T. Jones had in his possession, at that very time, the secret contract of sale of October 13th, 1886, and the four notes of $1,000 each, endorsed in blank, and which he knew belonged to the administrator of John E. Jones, if, indeed, the sale was *bona fide*. John T.

Jones held on to these notes until after an injunction in this suit prevented his assigning them (as he had made them negotiable), and then he gave them, not to the administrator of John E. Jones, Page, but to his own counsel and the counsel of McGruder and Jerry W. Jones. John T. Jones and McGruder went twice in the summer of 1886 to see Mrs. Jones, and induced her to go to her counsel, Messrs. Page & Carter and Col. John B. Young, to open negotiations for the division of the property; and it was John T. Jones who, from the inception to the close of the negotiations, was ever present and active as the agent and representative of John E. Jones, and who, as such, received from Messrs Page & Carter and Col. John B. Young, as counsel for Mrs. Jones, the formal typewritten proposition to give John E. Jones $9,000 worth of his wife's maiden property for his life estate in her said property; which said proposition he never communicated to John E. Jones, but, with which in his pocket, he operated upon John E. Jones to get him to sign a one-sided contract, which he drew himself, to convey, not only his life estate in his wife's property, worth $15,000 (as he had been distinctly informed by Thomas N. Carter and Col. John B. Young in his negotiations with them as the trusted agent for John E. Jones), but all his other property withal for the unsecured notes of $4,000, on long time, of his co-conspirator, McGruder, and his own young brother, who lived with him as a farmer boy, absolutely under his dominion, and who (the county records of Henrico show) was not assessed with one dollars' worth of property, real or personal, in 1886. And it was John T. Jones who, from the beginning of this litigation, has been ever present as the chief party interested, hunting up witnesses and attending their examination, whilst his puppet, Jerry W. Jones, has been invariably absent and never present on a single occasion.

George W. Jewett, a brother-in-law of the sisters of John T. Jones and J. W. Jones, a recent member of the Virginia legislature, and as closely connected in business and socially with

John T. Jones as any two persons ever could be, and who was a witness for the defendants, says that the four negotiable notes of J. W. Jones and Wm. M. McGruder for $1,000 each, payable at six, twelve, eighteen and twenty-four months from October 13th, 1886, could not have been discounted in the city of Richmond at any bank, or by any person knowing the condition of the drawers, and that he would not have discounted them at all.

The record shows that John E. Jones was often and intimately at the house of William M. McGruder; and that upon one occasion he was given a whole goblet of whiskey, and made beastly drunk, as a preparation for negotiations to sell some of his property to McGruder.

The Commonwealth had judgments against McGruder, as surety for one Huffman, sheriff of Henrico county, for $17,-213.63, principal, &c., besides interest. In anticipation of these judgments, McGruder had fraudulently conveyed all his property to one Ellett; and the Commonwealth had instituted suit to set aside the conveyance as fraudulent, and to subject the property to the payment of the judgments.

These judgments were liens upon McGruder's share or interest in the property claimed by him under the deed of 24th November, 1886, from John E. Jones and wife, if, in truth, the conveyance was not an arrangement in trust and for the benefit of John E. Jones, as Mrs. Jones and her counsel, Messrs. Thomas Nelson Page and Thomas Nelson Carter, were led to believe; they having not the slightest knowledge, intimation, or suspicion given them of the existence of the secret so-called contract and notes of October 13th, 1886, then in the possession of John T. Jones, who was present at the signing of the deeds. It was necessary, therefore, to get rid of these judgments; and, accordingly, on the 17th day of December, 1886, McGruder signed a communication to Colonel Marye, the auditor, as follows:

"I was surety for P. H. Huffman, sheriff of Henrico county, Va., immediately after the war. The Commonwealth, in 1867, obtained judgments against Huffman and his sureties for about $15,000. I desire to remove all doubt as to my liability on those judgments in favor of the Commonwealth, and therefore offer, as a compromise, $500 in lawful money of the United States, to have those judgments marked 'satisfied' as to me, to be paid within thirty days.

"WM. M. McGRUDER."

On this Marye endorsed, on December 20th, 1886:

"As proceedings have been pending for many years in the circuit court of the city of Richmond, to subject the property of Wm. M. McGruder to the payment of the judgments referred to in his foregoing letter, and, so far as I can learn, there is now no property visible, belonging to him, which can be so subjected, I propose to accept this proposition contained in said letter, provided the attorney-general and the judge of the circuit court approve such course.

"MORTON MARYE,
"Auditor Public Accounts."

On the same day, Attorney-General Ayers endorsed on this paper:

"I advise and approve the within."

This statement of Auditor Marye, based upon the distinct ground that there was no property *belonging to McGruder which could be subjected,* was accepted by McGruder; and on the same day, upon the foregoing statements and endorsements, the circuit court of Richmond city entered a decree, drawn by Mr. Gilliam, discharging McGruder upon his paying the $500.

If McGruder then claimed to be the owner (as he now does)

of one-half of the property conveyed to him and J. W. Jones by the deed of November 24th (recorded November 30th), 1886, in Richmond, then a deliberate and intentional fraud was perpetrated, systematically, upon the Commonwealth in the compromise suggested and obtained. If the statements made were true, then it is an admission of record that on the 20th of December, 1886, twenty-six days after the deed of the 24th of November from John E. Jones and wife to J. W. Jones and Wm. M. McGruder was recorded, he then had no property visible belonging to him, which could be "subjected" to the lien of a judgment. Is not the logic as merciful as it is inexorable, that McGruder knew that the property therein and thereby conveyed was not his in such a way that it could be "subjected;" but was conveyed to him on trust for John E. Jones, as Page and Carter were allowed, if not made, to believe, by the concealment from them and their client, Mrs. Jones, of the existence of the so-called contract of the 13th of October, 1886?

On the 23rd of December, 1886, McGruder and Jones executed to M. M. Gilliam and John K. Branch a deed of trust on a part of the property conveyed by the deed of November 24th, 1886, to secure the payment of a loan of $7,800, out of which sum a net balance of $5,258.47 went into the hands of M. M. Gilliam as counsel for J. W. Jones and McGruder; of which a balance of $4,018 22 was deposited in bank by the order of the circuit court, to the credit of the cause, March 11th, 1889.

Though John E. Jones lived until the 18th day of February, 1887, he never actually received one cent from J. W. Jones and McGruder on this transaction. In October, 1886, John E. Jones was the owner of an estate whose cash value was over $15,000, and the possessor of one much larger, for a part of which an offer of $9,000 had been made him through his agent, John T. Jones; and, in November, the same hapless and helpless John E. Jones stood stripped of every dollar he

had in the world; while his trusted friends and agents held it all, and were mortgaging it to raise money to pay their counsel's fees, and to buy themselves free from suits to set aside frauds which they dared not defend; and these same devoted friends and cousin held, withal, in their secret possession, endorsed in blank and negotiable, without any receipt to John E. Jones, even the worthless, unsecured notes which they had deceived him into thinking (if, indeed, he ever consciously saw them,) a consideration for the property which had been swindled from him, to soothe the sorrowing solicitude of his sympathetic cousin against the impending outrage of his property devolving upon his own dear children and heirs-at-law.

John E. Jones, after the deeds of November 24th, 1886, had been executed, retained possession of, and exercised every right of absolute ownership over, his property in Henrico county, and when he went to his agents, Sutton & Co., to collect his rents for the Richmond property, as usual, in December, 1886, and was advised that John T. Jones and Wm. M. McGruder had been there and notified them that they had bought the property and it belonged to them, and to pay the rents thereafter to them, he exclaimed, "Damn it, they are trying to cheat me out of it—swindle me!"; and his landlord, Robert Taylor, says that he repeatedly made the same statement to him, saying, pathetically, that he never thought his own cousin would rob him of every cent in the world.

The legal principles bearing upon the facts in this case are fully and explicitly laid down in *Moore* v. *Ulman*, 80 Va.; *Hickman* v. *Trout*, 83 Va.; *Fishburne* v. *Ferguson*, 84 Va.; *Low* v. *Trundle*, 78 Va.; *Davis* v. *Strange's Ex'or*, 86 Va.; *Samuel* v. *Marshall*, 3 Leigh; *Parr* v. *Saunders*, Vol. XIV. Va. Law Journal, pp. 437–8; 2 Kent's Comm., 484; 2 Minor (3d Ed.), 644; *Allore* v. *Jewell*, 94 U. S., 511; *Green* v. *Bridgeman*, 14 Vesey, 289; Kerr on Fraud and Mistake, pp. 94 and 190.

In the case of *Parr* v. *Saunders*, *supra*, Judge Staples, for

this court, said: "A transaction may, of itself and by itself, furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of the defendants, and even the evidence of witnesses. The circumstances attending and following a transaction are often of such a character as not to leave even a shadow of doubt as to the real object and motive of the parties engaged in it. * * * The motives and intentions of parties can only be judged of by their actions and the nature and character of the transaction in which they are engaged. These often furnish more conclusive evidence than the most direct testimony." In the case of *Samuel* v. *Marshall, supra,* Judge Tucker said: "The conveyance of the whole estate of a wretched sot, about whose capacity to contract, even for a valuable consideration, the whole country is divided, to a cousin, to the prejudice of four half sisters, reserving to himself but a life estate, and giving away the residue for nothing, cannot, I think, be sustained with any sort of propriety." Judge Tucker said, that, to attribute fraud to *the cousin,* rather than the intention to the grantor, to deprive his own family of their just inheritance, in favor of a stranger and an intruder, would be to "outrage human nature least.'

Our judgment is, that the appellants are entitled to a decree declaring that J. W. Jones and Wm. M. McGruder, nominal grantees in the deed of November 24th, 1886, from John E. Jones and wife, are trustees for complainants, and directing the conveyance to them of all the property embraced in the said deed. But that property has been encumbered by McGruder and Jones to the extent of $7,800. Of the net proceeds of that loan $741.53 were spent in paying taxes due on the property, and charges of parties ignorant of the true nature of the transaction, which appellants must lose. The balance of $5,258.47 went into the hands of M. M. Gilliam, counsel for Jones and McGruder, and appellants are entitled to a decree against the said counsel and J. W. Jones, Wm. M. McGruder and John T. Jones for that said sum of $5,258.47,

subject to a credit of $4,018.22, a part thereof deposited in bank to the credit of this cause, and a further credit of $180, paid on account of notes secured by the trust deed. And for a further decree against the defendants, William M. McGruder, J. W. Jones and John T. Jones for the sum of $7,800, subject to the credits of $5,258 47, and whatever was actually paid for taxes upon the property by them. Counsel of McGruder and Jones cannot retain for himself any part of the money raised by them on the property of the complainants, for services rendered to them, in part, in the very transaction in which the property was obtained. (L. C. in Equity, Vol. 2, Part 2, p. 1261, &c.)

The decree of the chancery court appealed from is wholly erroneous, and must be reversed and annulled; and the cause will be remanded to the chancery court of the city of Richmond for further proceedings in accordance with this opinion.

Decree reversed.