# Richmond

## CRAWLEY V. GLAZE AND OTHERS.

### March 11, 1915.

1. DEEDS—*Mental Weakness of Grantor—Fraud—Undue Influence.*
   The mental superiority of a grantee over a grantor is not of
   itself sufficient to avoid a deed where both parties have suf-
   ficient capacity to make a contract, but a bill which alleges
   that a deed was procured by the false and fradulent repre-
   sentations of the grantee, that the grantor lacked sufficient
   capacity to make a contract, and that the grantee exercised
   over the grantor an undue advantage and influence to obtain
   the conveyance, is good on demurrer.

2. APPEAL AND ERROR—*Presumption of Correctness of Decree.*—
   There is a presumption in favor of the correctness of the de-
   cree of the trial court, and the burden is on the appellant to
   show that the decree contains reversible error.

3. APPEAL AND ERROR—*Incompetency of Plaintiff to Sue—What
   Record Must Show.*—If a defendant intends to rely, on ap-
   peal, on the objection that the complainant is incapable of
   maintaining a suit in proper person, the objection should be
   made in the trial court in such manner that it will specifically
   and affirmatively appear in the record. The question is of
   too technical a nature to receive serious consideration when
   raised for the first time on appeal.

4. FRAUD AND FRAUDULENT CONVEYANCES—*Case in Judgment.*—
   Upon the evidence in the case in judgment, it is *held* that the
   conveyance sought to be set aside was the result of ignorance
   and imbecility of the grantors, and of deliberate imposition
   and fraud on the part of the grantee, and that the alienee of
   the grantee was chargeable with constructive notice of such
   fraud.

5. FRAUD AND FRAUDULENT CONVEYANCES—*Purchaser from Fraud-
   ulent Grantee—Restitution.*—A purchaser from a fraudulent
   grantee of land, who has notice of the fraud, cannot claim
   of the original grantor restitution of the consideration paid
   by him.

6. FRAUD AND FRAUDULENT CONVEYANCES—*Ratification.*—Before a ratification of a deed obtained by fraud can be binding it must be made with full knowledge of the rights intended to be waived; and the fact that the person defrauded has waived his rights and has intended to waive them must plainly appear.

Appeal from a decree of the Chancery Court of the city of Richmond. Decree for the complainants. One of the defendants appeals.

*Affirmed.*

The opinion states the case.

*Samuel A. Anderson, Boulware & Wallace* and *W. M. Justis,* for the appellant.

*David Meade White* and *Daniel Grinnan,* for the appellees.

KELLY, J., delivered the opinion of the court.

Elvina E. Glaze and Humphrey Glaze, her husband, instituted this suit in the chancery court of the city of Richmond to cancel and annul two deeds, one thereof made by them to V. M. Sutton, and the other made by V. M. Sutton and her husband, J. M. Sutton, to K. T. Crawley. There was a decree in favor of the complainants, and K. T. Crawley brings this appeal.

The record, owing to the length of the pleadings and the mass of evidence taken in the cause, is very large, but all the questions of law and fact necessary to a correct determination of the controversy, as we see it, will sufficiently appear in the course of this opinion.

The action of the chancery court in overruling the demurrer to the bill is made the basis of the first assignment of error. The record does not disclose the grounds of demurrer relied upon at the hearing of the cause, but from

the petition for appeal, adopted as the appellant's brief, it appears that two objections are now urged to the sufficiency of the bill.

The first objection is that the bill shows on its face "that the plaintiffs, at the time they executed the deed to V. M. Sutton, did so with the express intention and design of defrauding certain real estate agents out of commissions which were claimed by said agents," and that, therefore, the bill fails to state a case for relief. In support of this contention we are referred to the case of *Harris* v. *Harris,* 23 Gratt. (64 Va.) 737, and other decisions of this court, ending with *Nunnally* v. *Stokes,* 116 Va. 472, 82 S. E. 79, in which this court, in suits to annul conveyances, has recognized and applied the familiar maxim, *"Nemo allegans suam turpitudinem audiendus est."*

No rule is better settled in our law than the one here invoked, but it cannot be applied to the case in hand, as will clearly appear from the allegations of the bill considered in the light of the following statement by Judge Buchanan in *Nunnally* v. *Stokes, supra:* "While the bill charges that the appellant was mentally inferior to her grantee, Stokes, *it is not alleged, nor is it pretended, that she did not have sufficient capacity to make a valid contract.* It is well settled that where both parties are legally capable of making contracts, although one may be much superior in mental capacity to the other, that circumstance does not take the case out of the general rule, *unless it appears that some advantage was taken* or undue influence exerted to obtain the conveyance" (italics ours). See, also, *Tatum* v. *Tatum,* 101 Va. 77, 43 S. E. 184; *Smith* v. *Elliott,* 1 Pat. and H. 307.

As will conclusively appear in connection with the second ground of demurrer, the complainants in this case substantially allege the existence of the very elements which were wanting to warrant relief in the *Nunnally*

*case,* namely, their lack of sufficient capacity to make a contract, and the exercise over them of an undue advantage and influence to obtain the conveyance. Moreover, the bill charges that the false and fraudulent representations of J. M. Sutton, as to the danger of suits to collect commissions, were part and parcel of the general plan and scheme of fraud by which Sutton himself procured the conveyance.

There is no merit in this objection to the bill, and we pass to a consideration of the second and only remaining ground of demurrer, which is, as stated in the petition for appeal, "that according to the allegations of the plaintiffs' bill, the suit could not possibly have been maintained by the parties plaintiff for the reason that if the allegations therein set forth are true the plaintiff, Elvina E. Glaze, was manifestly incapable of maintaining a suit in her own proper person."

It will be observed, as above stated, that the construction thus placed by appellant upon the charges in the bill completely answers the first ground of demurrer, and renders wholly inapplicable to this case the general rule laid down in *Nunnally* v. *Stokes, supra,* and other cases of that type.

It is equally clear, we think, that the demurrer cannot be sustained upon this second ground. The record does not disclose, and counsel for the contending parties are not agreed, whether this defense was made in the lower court. If the question was not raised there, it is of too technical a nature to receive serious consideration when raised for the first time on appeal. *Bird's Committee* v. *Bird,* 21 Gratt. (62 Va.) 715; *Cole's Committee* v. *Cole,* 28 Gratt. (69 Va.) 365. See, also, *Richmond Ry. & Elec. Co.* v. *Bowles,* 92 Va. 738, 24 S. E. 388; *Jackson* v. *Counts,* 106 Va. 7, 54 S. E. 870.

The demurrer, whatever may have been the grounds urged in the lower court, appears not to have been argued until after the taking of the evidence was completed. We

cannot say whether the objection for want of proper parties was or was not raised at all, but there is a presumption in favor of the correctness of the decree appealed from, and the burden is on the appellant to satisfy us that the decree contains reversible error. *Smith* v. *Alderson,* 116 Va. 986, 83 S. E. 373; *Johnson* v. *Michaux,* 110 Va. 595, 66 S. E. 823. This rule of decision would seem to apply with peculiar force to a question involving, as does the one now being considered, the merest matter of form—the intervention of a nominal party as a next friend (there being no committee), who would have been merely "a shadow," as expressed by the president of this court in *Richmond Ry. &c. Co.* v. *Bowles, supra,* and whose nominal presence or absence it is now manifest could not possibly have helped or hurt the rights of any party at any stage of this cause.

Without deciding whether there would have been any merit in the point if it had been raised at the late stage in the proceedings at which the demurrer was argued, we have no hesitancy in holding that if the appellant intended to rely upon this objection to the bill as a ground of reversal in this court, he should have made the objection in the lower court in such a manner as that it would specifically and affirmatively appear in the record.

Coming now to a consideration of the remaining assignments of error, which challenge the correctness of the decree complained of in its findings against the appellant on the real merits of the case, we cannot, within the reasonable limits of any written opinion, attempt a complete and detailed discussion of the charges and counter-charges of the parties and the evidence respectively introduced in support thereof, set out in a record containing over seven hundred printed pages, but must, in the main, be content to state merely our conclusions, arrived at after a patient and careful consideration of the entire record. A discus-

sion, even thus limited, will of necessity be rather a lengthy one.

As we see this controversy, a correct solution of it depends upon the view to be taken of the deed dated September 28, 1909, from E. E. Glaze and Humphrey Glaze to V. M. Sutton, for, as we shall see, Crawley occupies no higher position, from a legal and equitable standpoint, than Sutton acquired by this deed.

With reference to this deed, the learned judge who pronounced the decree complained of said in the course of the written opinion which he filed with the record: "All must admit that if this suit had for its object the setting aside and cancelling of the deed from Glazes to V. M. Sutton, the passing of a decree canceling the said deed would be proper." In this statement we fully concur. It seems to us impossible to follow the events and circumstances leading up to and surrounding the making of this conveyance, as disclosed by the record, without becoming fully convinced that this conveyance was the result of ignorance and imbecility on the part of the Glazes and of deliberate imposition and fraud on the part of J. M. Sutton. We are further of opinion that K. T. Crawley is, to say the least of it, chargeable with constructive notice of this fraud.

The transaction belongs to that class which is so well described by Judge Staples in *Parr* v. *Saunders*, 11 S. E. 981, 14 Va. L. J. 437, as follows: "A transaction may of itself and by itself furnish the most satisfactory proof of fraud, so conclusively as to outweigh the answer of defendants, or even the evidence of witnesses. The circumstances attending and following a transaction are often of such character as to leave not even a shadow of doubt as to the real object and motive of the parties engaged in it * * * Experience attests that in a majority of cases fraud can only be established by circumstances. The motives and intentions of the parties can only be judged of by their action, and

the nature and character of the transaction in which they are engaged. They often furnish more conclusive evidence than the most direct testimony." See, also, *Jones* v. *McGruder*, 87 Va. 360, 12 S. E. 792; *Hazlewood* v. *Forrer*, 94 Va. 703, 27 S. E. 507; *Fitzgerald* v. *Frankel*, 109 Va. 607, 64 S. E. 941.

As usual in cases of this character there is much conflict in the evidence, but we are satisfied that the weight of the evidence warrants the following statement: Humphrey Glaze was mentally weak, addicted to drink, and an easy victim in the hands of such a man as J. M. Sutton. Elvina E. Glaze's mind was seriously impaired as the result of illness, and she was not competent to protect or understand her own interests. She was the owner of the farm in question. In August or September, 1909, her husband, acting for her, listed it for sale with the Rudd Realty Company, of Richmond, and J. B. Martin, an associate of that concern, took charge of the proposed sale for the Glazes. The L. W. Wells Realty Company, at that time operating in Richmond, had as an associate the said J. M. Sutton, who appears in the record to have been so thoroughly dishonest and unscrupulous in character and in methods that any person of average intelligence, upon anything like an intimate association with him, could scarcely have failed to discover that he possessed these characteristics. At this same time a firm called the Taggart-Frayser Company was doing a real estate business in Washington, D. C., and had control of the property in that city which figures in this case. The Wells Company represented the Taggart-Frayser Company in Richmond. The said J. B. Martin, associate of the Rudd Company, had a conversation with the said J. M. Sutton, associate of the Wells Company, looking to an exchange of the Glaze farm for income-bearing property. Sutton suggested what he called an apartment house in Washington, giving Martin a descrip-

tion of it, and Martin in turn took this description up with Humphrey Glaze, who was favorably impressed with it, and thereupon L. W. Wells and J. M. Sutton took Glaze to Washington to see the property. On that trip (and afterwards) the property was represented to Glaze by Sutton and others speaking for Taggart-Frayser Company as being very valuable. Its purchase, if it was worth what they represented, would have netted Glaze and wife much more than they were asking for their farm. Glaze thereupon signed an agreement, as agent for his wife, for the exchange of the properties. Glaze drank whiskey and beer rather freely with Sutton on this trip, and continued to do so to the end of the negotiations. Upon their return from Washington, Sutton (who from that time to the conclusion of the transaction seems to have had Glaze completely under his control) busied himself to procure the signature of Mrs. Glaze to this contract. Mrs. Glaze was not in a mental condition at that time to understand what she was doing, and Sutton could not well have failed to perceive that this was true. Thereafter, with Sutton still a conspicuous figure Glaze and wife went to the office of Rudd & Company and signed the deeds necessary to carry out the exchange. Miss Fleming, a friend of Mrs. Glaze, who was present, as she says, because Mrs. Glaze did not know what she was doing, had an understanding with Rudd & Company not to deliver the deeds until they were satisfied that $5,000 could be borrowed on the Washington property, the availability of this property for a $5,000 loan having apparently been at that time fixed upon as a test of its minimum value. When Taggart-Frayser Company presented the deeds for the Washington property to perfect the exchange, they were informed of the conditions upon which the Glaze deeds had been left with Rudd & Company, and the understanding reached at that time seems to have been that the matter would remain *in statu*

.*quo* until Rudd & Company could be satisfied upon this point. Shortly after this understanding was reached, to-wit: on the 28th of September, 1909, without the knowl-edge of Rudd & Company, J. M. Sutton obtained a deed from Elvina E. Glaze and Humphrey Glaze for the farm, reciting a consideration of $6,500, none of which, as a mat-ter of fact, was paid. · The first intimation Rudd & Com-pany had of such a deed came to them from the "Daily Record," showing that the deed had been executed and recorded.

It is charged in the bill, and we think it is established by the evidence, that after Rudd & Company refused to give up the exchange deeds, J. M. Sutton wrongfully, falsely and fraudulently represented to the Glazes that the Taggart-Frayser Company was going to sue them for not carrying out the contract of exchange; that Rudd & Company were about to sue them for commissions; that they would lose all their property unless they did some-thing without delay to save it; that Sutton succeeded in making complainants believe that this danger was a real one, and by this means, and by false claims of friendship, and by the free and frequent use of whiskey with Hum-phrey Glaze, all with the purpose of defrauding the Glazes, gained the confidence of the complainants and persuaded them that it would be best for them to convey their prop-erty to him, cautioning Glaze to say nothing about the conveyance. In the meantime, on the 16th day of Septem-ber, 1909, by a written contract which was signed by Tag-gart-Frayser Company, L. W. Wells, agent, J. M. Sutton and Kenner T. Crawley, and witnessed by A. R. Anglea, the Taggart-Frayser Company agreed to convey the farm in question to Kenner T. Crawley in consideration of $3,630, to be paid one-third cash and the balance in one and two years, and Crawley at that time paid, as shown by the contract, $105.00 as a cash guarantee for the sale

of the property, "the said A. R. Anglea to hold $100.00 until said deed is acknowledged correct by Kenner T. Crawley's attorney." In other words, Taggart-Frayser Co., Wells and Sutton were by this contract arranging with Crawley and Anglea to sell to Crawley for $3,630 the property which Taggart-Frayser Co. was trying to get from the Glazes in exchange for Washington property which they had repeatedly told the Glazes was worth several times that sum. The Glazes knew nothing whatever about this contract. A. R. Anglea, mentioned in the agreement, was an acquaintance of Crawley who had previously had other real estate transactions with him. The attorney for Crawley, referred to in the agreement, was P. A. L. Smith, who attempted to represent the Glazes in one phase of this complex and ramified transaction, and to represent Crawley in another, and whose connection with the matter is, we think, fairly summarized in the opinion of the judge of the chancery court as follows: "P. A. L. Smith was at least indiscreet in serving two clients in the same transaction at a time when the interests of each required free, independent and conflicting duties. It is true when Smith found out that the Glazes were about to lose all their property he probably did all he could to regain their property for them. His loyalty to Crawley who had been his client before the Glazes were, and who was his client in the examination of the title to the property in dispute, and for whose security in the title he showed great interest, evidently so biased his judgment that as between Glaze and Crawley he was not an impartial and free adviser."

On October 7, 1909, J. M. Sutton and wife conveyed the farm to K. T. Crawley for an expressed consideration of $3,630, one-third of which, according to the recital in the deed, was to be paid "in cash, and the balance in one and two yearly instalments, evidenced by negotiable notes and secured by deed of trust." On the same day Crawley

executed to C. H. Sutton (in no way related to J. M. Sutton) a deed of trust on the farm to secure one note for $1,696, payable one year after its date. Crawley seems to have paid to Sutton the amount of the cash payment recited in said deed, and assumed a mortgage of $1,000.00 on the farm, and claims that the note secured by the deed of trust was made for $200 more than the balance of the purchase money because he needed about that amount to use in improvements on the farm, had exhausted his cash, and it was expected that the note would be at once discounted through C. H. Sutton, the trustee. At any rate, he and some representative of Taggart-Frayser Company had the note in their possession and were trying to get the cash on it after the deed from the Suttons to him had been made. The note was in J. M. Sutton's hands when this suit was brought. The trustee, who had no sort of connection with these negotiations with the Glazes, seems to have at one time told Crawley that he would arrange for the discount of this note, but he subsequently declined to handle it, as he explained to Crawley, because he had heard that the transaction was not straight.

Crawley lays much stress upon the fact that Humphrey Glaze was present when Sutton delivered the deed for the farm and got the cash and note. Beyond a doubt Glaze was there. In fact, he had been in Sutton's company, not to say his custody, practically all the time for some days. He was a pitiful figure in the scenes presented when these papers were passed. He had been drinking with Sutton that day and for several days, part of the time to excess, and even when sober he was weak and gullible. It may be well in this connection to note the others who were there. P. A. L. Smith was there, undertaking to act for Glaze, and yet as shown in Judge Moncure's opinion, *supra*, and in the actual occurrences at the time, more interested for Crawley, and he was not in a position, however good his

intentions may have been, to fairly and safely advise Glaze.
and permitted a transaction to be consummated which he
now says he knows was a mistake and which we think an
unbiased judgment on his part would never have permitted.
M. Davidson was there with a personal interest in the re-
sult, and says that Glaze was "intelligent." The bias of
this witness is clear upon a view of the whole of his depo-
sition. Mr. Ryan, whose only connection with the matter
was to represent M. Davidson and who is in no way in-
volved otherwise, was there. His testimony is to the effect
that Glaze seemed to him "intelligent" and "not different
from his normal condition;" but, so far as the main
transaction was concerned, Mr. Ryan says that he had
already become "exceedingly suspicious" of it from what
he had observed in talking with Sutton and Wells. Craw-
ley was there. He had already been warned as to the
fraudulent character of the deed from Glazes to Sutton,
but he was buying the farm as a speculation, and was
proceeding to complete his purchase at a figure which he
was bound to know could not net the Glazes over half the
consideration recited in their deed to Sutton, upon which
nothing had been paid. Sutton was there and got the cash
and the note. Humphrey Glaze got nothing, and Elvina
Glaze, the owner of the property, was not there and had
never even heard of the sale to Crawley.

Under these circumstances, we cannot think that the
presence of Humphrey Glaze does more than to emphasize
the extent to which he and his wife were imposed upon
and defrauded. They at no time got any of the money.
Sutton received that, and he and Wells divided it; and
while it does not so appear in the record it was conceded
at the argument of·this case that since the trial of the case
in the lower court both Sutton and Wells had left the State
and taken the money with them. The note was finally turned
over by Sutton to P. A. L. Smith, and by him filed in this

cause, and was ordered canceled by the decree of the lower court.

In the negotiations which led to the conveyance to Crawley, Sutton, the chief actor, says that he was "working under the instructions of Wells, Smith and Anglea and people interested in the business." In the light of the facts disclosed by the record, we would attach very little weight to the unsupported statements of Sutton, but we think the record shows that, if not working under their instructions, he was certainly in very close touch with the parties he named, and with the Taggart-Frayser Company.

Not to further prolong this discussion, we are of opinion that the deed from Glaze and wife to Sutton was clearly fraudulent, and that Crawley must be charged with knowledge of the fraud. As Judge Moncure, of the chancery court, says in dealing with the information which Crawley had, "it was quite enough to put him on inquiry, and proper inquiry would have disclosed to him all the fraud charged and shown in this record, which should have prevented him from further proceedings in the purchase." While he disclaims all knowledge of the fraud, he admits that he knew that no consideration had been paid for the deed from the Glazes to Sutton, and that the witness Schroetter had told him that he regarded the transaction as fraudulent. There is other direct evidence to the same effect, and a significant, if not a conclusive, circumstance against him is that he had great difficulty in remembering whether C. H. Sutton informed him of the probable fraud *before* or *after* he got his own deed from V. M. Sutton. If his own course had been clear he should have been able to say instantly that this information came *after* he closed the trade. We think it clear that if Crawley did not have actual knowledge of the fraud, he and his attorney, Smith, both knew enough to put him on notice, and this being true, he can claim nothing under the con-

veyance, and his claim that he should at least be given a lien on the land for the cash paid by him to Sutton must be denied. He does not occupy the position of an innocent purchaser in any sense or to any extent, but his position is rather that of a participant in Sutton's fraud and breach of trust. Upon familiar and well settled equitable principles, he cannot claim any restitution from the Glazes. See *Jackson* v. *Counts*, 106 Va. 10, 11, 54 S. E. 870; *Barksdale* v. *Finney*, 14 Gratt. (55 Va.) 338, 348, 349.

In his answer and in his disposition, Crawley emphasizes the fact that he told Glaze at the time that if the Washington deal did not go through and Glaze should want the property back he, Crawley, would reconvey it upon a return of the consideration. This offer was unusual and not according to the ordinary course of business between strangers, and does not appear to us to help his standing, but rather, under the circumstances, to create a further suspicion against him.

It is contended on behalf of Crawley that the Glazes, after they learned of the fraud which had been perpetrated upon them by Sutton, waived the fraud and ratified the transaction by attempting to recover from Sutton the money which Crawley had paid for the farm, and by asking permission of Crawley to remain on the farm for a short period of time, but we do not think the record as a whole bears out this contention. The suit was brought in a very short time after the deed was made to Crawley, and was instituted promptly after it appears that Glaze sobered up and was brought to anything of a realization of what had happened. It is well settled that before a ratification of a transaction of this kind can be binding, it must be made with full knowledge of the rights intended to be waived; and the fact that the person defrauded has waived his rights and has intended to waive them must

plainly appear. *Fitzgerald* v. *Frankel,* 109 Va. 610, 64 S. E. 941.

With reference to the contention that the property was sold to Crawley for an adequate price, we think the evidence justifies the conclusion expressed in the opinion of Judge Moncure, that the property was worth considerably more than the consideration expressed in the Crawley deed; and in addition to this fact it appears very clearly that Crawley and his attorney knew, or ought to have known, that Sutton was claiming and would certainly appropriate something like one-half of the cash payment on account of expenses and advances which he said he had incurred and made on behalf of Glaze in connection with this sale. This would have reduced the net proceeds to Glaze to a grossly inadequate price.

The decree of the chancery court was plainly right and must be affirmed.

*Affirmed.*